Good morning. Before we begin, I'd like to thank Judge Norma Shapiro for sitting with us. This is my third occasion in which I have been not just privileged but blessed to be sitting with her, and I hope that there are many more. Thank you, Judge Shapiro. It's also my first time to be sitting with one of our newest judge, I should say, Judge Hardiman, and I look forward to a lifetime of sitting with you, Tom. So we'll begin. Thank you. May it please the Court, Kevin Auerbacher, Deputy Attorney General on behalf of the New Jersey Department of Environmental Protection. Just for the case for the record, let me just note the case. It's New York-Susquehanna Western Railway Corp v. Lisa P. Jackson et al., number 07-1675. And how much time did you wish to buddle, Mr. Auerbacher? Three minutes, Your Honor. That would be fine. And Mr. Strickland will address the Court for five minutes. That's correct. That's fine. Thank you. At its core, this case implicates the State's ability to protect the environment and public safety from the well-known hazards of solid waste, an area that Congress left to the primary responsibility of the States in the Resource Conservation and Recovery Act. Now, your 2D regulations regulate what here? Solid waste occurring at transfer stations adjacent to rail facilities, Your Honor. So and you're saying that applies to all five of these facilities here? It applies to all five of these facilities. However, I should note that three of the facilities have, since the commencement of this litigation, have terminated their operations. In fact, the two facilities that were operational still are the 94th Street and the MHF facility. The 94th Street facility is currently closed down, has been shut down by the New Jersey Department of Community Affairs for construction code noncompliance. But that's not before us today? No, Your Honor, it is not. I'm just, the status of the facility is it's currently closed. Three of the facilities are permanently closed, three of the five. All five facilities are within a four-mile distance within one town, North Bergen, in northern New Jersey. Mr. Auerbacher, it's commonly said that the, and by the Surface Transportation Board, that the Act, the ITTCA or whatever, does not preclude health and safety regulations so long as they don't interfere with railroad operations and so long as they're nondiscriminatory. That's right, Your Honor, and the 2D regulations are neither unduly burdensome or discriminatory. That's what I wanted to ask you. I can't find from the lower court opinion the extent to which the 2D regulations differ from those imposed on non-railroad waste disposals. The key difference, Your Honor, and the Department took a conscious effort to address the case law that had developed under ITTCA, which says pre-approval, permitting is not permissible. Those aren't part of the 2D regulations, and the delay is what caused the STB in court's concern. That's not part of the 2D regulations. There's no pre-approval, there's no permitting requirement. With respect to the discriminatory, quite frankly, because they don't, the 2D regulations did not have the pre-approval, they're actually less onerous than the regulations that would apply to any other transportation, and we've heard that cry from the rest of the waste industry that these are really unfair to us. So they're not discriminatory, they're actually less burdensome than it would be if you were in the waste industry generally. The lower court said they also have to be nondiscretionary. Do you find any nondiscretionary aspect of what the Service Transportation Board has required? I think that the STB as itself, last May there were hearings before Congress on the abuse of the ITTCA provisions in the solid waste arena, and the General Counsel's Office spoke to Congress, and she indicated that the 2D regulations were just the kind of regulations that pass muster under ITTCA and are satisfactory to the STB, because they lack the pre-approval permitting aspect that other courts have found troublesome. A lot of your brief was spent trying to suggest that the railroad was processing waste as well as transloading it. That's right. Why does that matter? That matters, Your Honor, because, and this is also pointed out in the brief filed by the National Solid Waste Management Association that represents the industry that's not rail adjacent, and it's really a distinct business activity. If you look at the testimony before the Court and the discovery that the State took, the limited discovery that the State took, you'll see that, like in the case of the 94th Street facility, the shipper, there's a shipper, there's a logger, the shipper is pulling out metals. Metals have great value. Those are not, the waste is not arriving at the site. But isn't that part of transloading? No, it's not, Your Honor. The Court did find that, but we submit that that was an error for the Court to find that because they're distinct business activities. But your regulations, don't they primarily regulate storage and how one goes about storing? No, the regulations regulate the activities that occur at a transfer station. The activities that go on, the sorting, the processing, may cause emissions. And there's the waste industry who's, any of these transfer stations all over New Jersey, they're doing the same type of thing. It makes sense to pull out the metals. They benefit from that. But that's a distinct business activity. That's under the STB and the Court case law. It's not manufacturing. I mean, one case from the STB talks about the difference between manufacturing. This is not manufacturing. This is just sorting it out, storing it, transloading it. Why isn't that all? I mean, it's a pretty broad statute that you've got here on the federal level. How would you, if somebody came to you as a counsel and said, okay, I'd like to engage you to do a transloading facility that will qualify as transportation by a rail carrier, what would you advise them to do differently than what New York Susquehanna is doing now? I think that if you did a straight transloading, it would be different. You come in with containers and there are facilities like this that don't have the environmental impacts, and I'm sure the Court's seen the pictures. You come in, you straight transload it. They're not doing that. There's a whole continuum of activities. The C&D, the shippers are all, they have construction and demolition debris-related companies. The waste comes in, the shipper charges a rate to dump at this facility. Then the shipper takes out the materials. They take out so-called non-compliant material. They take out recycled materials. That's the waste industry. That's a waste business. But when you look at the definition of transportation in the ICA, I mean, it's a locomotive, a car, a vehicle, a facility, equipment of any kind related to the movement. So just related to, it doesn't have to just involve solely the movement. Relating to the movement of property by rail, regardless of ownership, concerning use of, and any services relating to the movement, including receipt, delivery, transfer, refrigeration, ventilation, storage, handling, and interchange. I mean, that's, what else could they? Yeah, but look what they're doing. I mean, the case, well, you pointed out, I think the Riverdale case, or you're referring to, there's a number of cases that talk about manufacturing. There's the Florida East Coast. There's the growers market. There's Riverdale. If I may, I just want to make one point. One of the key aspects of the contracts that I would respectfully urge the court to look at is, these are exclusive facilities. These are not common carrier facilities. The arrangement is, the shipper, under their contract, well, the rail carrier has one customer. It's the shipper. Shipper has related- What difference does that make? The difference it makes, Your Honor, is that given that it's one customer, the rail carrier- It's not a rail carrier? It's not a rail carrier. With respect to these five facilities, they're not operating as a common carrier, because it's exclusive. But by the terms of your 2D regulations, they apply only to rail carriers. That's true. So why are we here? Why we're here? Because there's two arguments by the state. We took discovery, and we, similar to HITECH, similar to the JP Rail case, geared at, what are the responsibilities of the parties? What's the responsibility of the shipper? What's the responsibility? Who's taking on the responsibility? And under the arrangements that really, quite frankly, are, to make it appear like a rail carrier, it's really a shipper-controlled facility. And the control is key to this. But if they're not a rail carrier for purposes of the federal law, how are they a rail carrier for purposes of the 2D regs? If they're not a rail carrier for purposes of the 2D regs, then the Salt Waste Management Act applies. The full Salt Waste Management Act applies. Could I ask you, if MHF isn't different, doesn't it make a difference that your argument fails where you have sealed, no dumping, no tipping, but you really have transferred from a sealed container to a sealed railroad car? In terms of processing, there's a number of arguments. I mean, they're conducting their business differently. I will acknowledge that. 94th Street's doing processing. The way the MHF operation transformed itself, they moved from construction demolition debris to more contaminated soils, where it's stricter. But there's no processing there? There's no processing, but the contract's the same. You still have the same common carrier issue and concern. It's exclusive. There's one customer. The common carrier is not able, under the Union Line case, which we suggest supports our position, you need to be able to provide service to all upon reasonable request. The rail carrier has divested their ability to provide service upon reasonable request under the contract. They only serve one customer. Does the Surface Transportation Board agree with you that New York, Susquehanna, and Western is not a common carrier? That specific, I mean, the argument, Your Honor, is not squarely before the Surface Transportation Board. What we're saying is they may be licensed by the Surface Transportation Board or its predecessor, the ICC, but they are not, with respect to these facilities, they're like private in-plant facilities. They're not opening it up to the public. They're not fulfilling their common carrier responsibility. So I would say that issue really isn't before the Surface Transportation Board. So the state would be happier if they were dumping, tipping, and loading 24 hours a day instead of 12 hours a day or however many hours a day they're doing it? You're saying they're not opening themselves up amply enough to the public? You want them there 24 hours a day? You want them to have more clients rather than the clients with whom they've contracted? That's not exactly what I'm saying, Your Honor, respectfully. What I'm saying is there's law, common carrier law, and under the law of common carriers, you need to, in order to affect the preemption under ICTA, you need to be operating as a common carrier, providing service to the public. They're not doing that. They're doing it, they have an exclusive arrangement with one customer. But they publish their rates, don't they? They publish their rates. It's just one customer comes in and takes it all. It sounds like that's a great deal if you're in a position of the railroad here. You don't have to deal with a whole lot. You've got one. The only trouble you have is if that one customer bolts on you. There's two sets of rates. I mean, the shipper's also charging rates. The shipper's the one that's really marketing the facility. The railroad can't market the facility. They have one customer. They have a contract that says you can't provide service to anybody else. It's the sole discretion of the shipper as to whether anybody else can dump you. And that's not a... That's because they're fulfilling all the output slash input, right? I mean, are you saying that you could never have an output contract in this arena because having an output contract renders you no longer a common carrier? What I'm saying is the way that the contract's been devised, they have totally... It doesn't matter what the tonnage is. It is the exclusive decision of the shipper to determine whether anybody else can dump there. There's a competitive advantage here. The shipper, who also has a construction demolition related company, in the case of 94th Street, in the case of 16th Street, and the other haulers, they want the competitive advantage. They can say, I'm Cardella, 43rd Street. I only want my companies to dump here. I have the advantage. I'm the sole shipper. The rail carrier can't go to the public at large and say, come on and dump here. The service is available. We're a common carrier. Because the right to determine who dumps there is on the hands of the shipper, not the rail carrier. Thank you. Sorry, did you have a question? I had a question. Go ahead. Go ahead. As I understand the judge, it was all or nothing, either the 2D regulations could be applied or not. Would you argue or concede that some could be appropriate and others not? I don't think there's a record at all to say that the 2D regulations don't pass. I mean, there's no clear and manifest purpose of Congress to pre... No, I don't think that's the question. The question is, or let me just add on to it, might it not be appropriate to remand back to the district court to, if, for example, we were to adopt the case like Green Mountain, to remand back and say, okay, take a look at these regulations one by one to see if they unduly discriminate and if they are unduly burdensome, rather than dealing with it as a whole. Very well, Your Honor. What I would say is the burden on anybody bringing in a challenge to say whether a particular regulation is unduly burdensome and therefore preempted on ANICBA lies with New York's Susquehanna. They didn't make that showing. They made a conscious effort to say absolutely nothing. The state has no power to regulate health and safety, particularly in this... But if you were in their position, you'd make the same argument. The point is, if the state does have some power, provided that it's not unduly burdensome and it does not discriminate, which is oftentimes what's happened in the past, and there's a balancing. If you sent it back, basically you would be able to go one by one and argue as to whether a particular regulation fits or doesn't fit. Right. Okay. Well, I would say the court could have done that, but it did not. And I, again, reiterate that New York Susquehanna didn't make any attempt to demonstrate burden. They simply said it doesn't fly. You want a home run or a strikeout? Is that what you're saying? No. I understand what you're saying, Your Honor. The district court could examine on a remand the burden imposed by each of the 19 requirements under the 2D reg. I appreciate that, Your Honor. Why don't we pick up on that particular point with Mr. Strickland then. All right. Thank you, Judge. You're welcome. Good morning, Your Honor. Today I please the Court, Carter Strickland for amici. Thank you very much for allowing the amici to participate. If we may, Mr. Strickland, let's pick up where Judge Shapiro's question that I sort of added on to. Is there a way to split the baby here by sending it back and asking the court, in light of the test, if we were to adopt Green Mountain, to look at these regulations one by one, rather than they either all pass or all fail? If I may, Your Honor, we disagree with Green Mountain, but I don't necessarily think that this Court has to follow that. I think that Green Mountain added on several elements to its test, and all courts have been struggling to find out what the answer is. Besides unduly discriminate and unduly burden, what else did they add on? They added this test, which is nowhere in the statute, about whether the regulations at issue involve too much discretion on the part of the agency. I do think that, and amici, I do believe that... But you understand why. I mean, if you have, for example, one of the places is temporarily shut down, and oftentimes, in the past at least, there has been a permitting process or something of that kind that's been used to hinder the ability of a particular facility to operate. If there is too much discretion with respect to permitting, you could see how that could interfere, if you will, with the federal statute in a particular situation. I suppose it may in a particular situation. However, ICTA really doesn't contain that test. We do think, we would argue if the 2D regulations... In effect, what they're saying is that's part of the unduly burden. If you're giving too much discretion, that is a factor to take into account in determining for a district court, or a court of appeals, as to whether there has been a burden that is undue. If it's folded into that general test rather than a stand-alone test, that might be better. The Solid Waste Regulation... Counsel, was there such a determination by the district court, or did the district court decide any discretion would be unlawful? That's how we read the decision, Your Honor. Everyone seems to concede that fire regulations would be permissible. I can't conceive of a fire regulation without some discretion for non-railroad carriers, so that if that is the test, any discretion, wouldn't that just invalidate all regulations? We do think that that's how the test would play out, Your Honor. Courts have, and the STB itself, and the railroad have said that those fire codes, plumbing codes, same thing. That certainly imposes costs. That could be used to shut down. To take it a step further at the federal level, if there's anything that's transportation by railroad, it's locomotives. We don't argue with that. EPA just published emissions regulations for those locomotives. Well, under the reading of the statute that the railroad and the lower court proposed, those EPA regs would be invalid, as would any regulations under the Federal Rail Safety Act. District circuit courts, the 6th Circuit, the 8th Circuit, the 11th Circuit have been clear that ICTA does not preempt all laws, and certainly not even all laws that impose costs on the railroads. We don't see any principle distinction between allowing plumbing, fire, safety, local codes, allowing federal environmental regulations, and disallowing state regulations. The statute speaks about federal and state law alike in the same breath. They all impose costs. There's no real principle distinction for elevating plumbing codes over state solid waste regulations, which have more to do with the health and safety of the populace than certainly do plumbing codes. I think there's an important distinction there. I recognize the statute says that it preempts federal and state law, but the fact that it says it preempts federal law begs the question. That's left then for courts to try to harmonize competing federal statutes. When you're talking about things like plumbing electrical, on the one hand, and solid waste disposal on the other, or the 2D regulations at issue here, isn't the question whether or not it's a burden on interstate commerce. And for a fire marshal to come in and make sure that the exits are proper in a building, that's a far cry from these regulations that give extraordinary power to the local authorities to inspect at any time without notice, make sure there are no rodents or arthropods, et cetera, et cetera, et cetera. This is a far cry from a plumbing electrical or fire code, is it not? I see my time is up, but I'll go right ahead. But there's no principle distinction between that kind of – there's certainly a greater burden imposed by, say, diesel regulations. And other companies, other waste companies, as you've seen from the other amicus brief, other rail companies, have been able to live with these state solid waste regulations. So it's not as though they're putting the waste companies out of business in New Jersey. But state solid waste is about intrastate commerce. That's about taking something from one neighborhood and transporting it to another and putting it into a landfill. Here we've got consummate interstate commerce, taking it from New Jersey and transporting it across Pennsylvania into Ohio or wherever it ends up. I respectfully disagree on a state solid waste statute at issue. Regulates, say, truck-to-truck transfer facilities. Truck-to-truck transfer facilities, even if the truck goes out of state, is regulated. Truck-to-rail somehow, because what we submit is a misreading of ICTA and a lack of focus on the remedies word of the statute with neither the lower court nor railroad address, somehow that's unregulated. But isn't that because Congress has put – I agree with you, but isn't that because Congress has given the rail privilege status? What it gave rail was – and if you look at the legislative history, which we lay out in detail in our brief, they focused on deregulating rail economics. They talk time and time again about the federal policy of economic regulation, they say, in the legislative history. Federal and state law generally are not preempted, and that's why Judge Shapiro's argument about and Judge Ambrose's argument about shouldn't we remand it to see whether these laws are generally applicable? I think it's a fair test. I don't know if we said shouldn't. Should. Okay, fair enough. The court could do that, and we submit that the court should do that. Thank you.  Thank you, Your Honor, and may it please the court. I am Paul Motes on behalf of the New York Susquehanna and Railroad Corporation. It is a railroad that has been in existence since 1881. It most certainly is a certificated STB rail common carrier. There's no question about that. Let me ask you in terms of a test that we would apply. If we were to agree generally with the Green Mountain test, which talks about you look at whether a regulation unduly discriminates and or unduly burdens the activities of the rail carrier, would you have a problem with that? I would not. I endorse the Second Circuit's decision in Green Mountain, and I believe Judge Hayden very carefully read that decision, referred to it when she made a finding, Judge Shapiro, at page 35 of her decision. I'm sure you've seen it, where she concluded after a careful analysis of the record, much of which Mr. Auerbacher is frankly asking you to reweigh here today, she found, if I may quote, these regulations are intricate, detailed, and deliberately address as many aspects of the transloading activity as possible, inevitably and on purpose. Their impact on transloading is serious and serves local concerns, and as such they have too large an impact on transportation by rail carriers. Let me go through with you, if I may. I'm sorry, Judge Shapiro, you go first, and then I'll pick up on that. Well, I'm interested in your saying you accepted Green Mountain, because as I read your brief, you had an all-or-nothing approach. You did concede that in a recent decision out in California, they said that such-as fire and plumbing codes would be accepted, but you read that as being only fire and plumbing. Such-as means there must be other things in addition. And, indeed, I think Green Mountain conceded that if you dumped hazardous waste in a creek, that might violate some regulation. So that if you concede that there are some things that the state could regulate, I would like to know, for example, how the state could determine whether regulation is needed if you didn't allow inspection. How would an inspection to see if there's a fire hazard burden the railroad? Well, number one, Judge Shapiro, I do agree. I think we conceded throughout this case, and I'm not sure concession is the right word. It's been the position of the railroad from the first day in front of Judge Hayden that we never said, contrary to what was represented here, that ICTA preempted all state regulation, and certainly not that it preempts federal regulation. And, Judge Hardiman, you have it exactly right. When there's a conflict with the federal statutes like RCRA, the court has to harmonize those, and Mr. Strickland's client has a case in front of another judge in Newark raising just those issues against Susquehanna. We have not pled ICTA preemption to get rid of that case. But what is the answer to Judge Shapiro's question about inspections? We have allowed inspections by the NJDEP and the Meadowlands folks since the first day of this litigation. They've never denied access. The state, excuse me, the local, the Department of Community Affairs fire marshal, has not only inspected, but as was suggested, one or two of these facilities have been shut down during the pendency of this appeal. One of them reopened just yesterday when the local fire marshal said, okay, your sprinkler system is okay, you may go ahead. But Judge Hayden's opinion invalidates all of them. Well, Judge Shapiro, I think there's a reason for that, and that's because the state applied these regulations in their totality to the Susquehanna. They essentially tried to shut us down. They said we owed a $2.5 million fine, which for a railroad of this size, which it isn't a very big railroad, was devastating. And she very much took that into account and had us present extensive evidence, both written evidence and a couple of days of hearing, as to what really was going on at these facilities. She saw the pictures that Mr. Auerbacher referred to. She saw more current pictures that we introduced that show that the facilities that exist there today are not these big open piles of waste. They are, in fact, transfer operations taking place inside buildings. I guess my question is, Judge Ambrose, wasn't it the judge's job to take each of these regulations and point to where in the record they were prohibited? Because it's clear to me that some are permissible and some are arguably not. Well, in defense of Judge Hayden, I don't think that that was the way the case was presented to her, and I don't think it was incumbent upon her to try to parse through each of these regulations with respect. I mean, they were applied in their totality. There's no doubt, as she found, that in their totality they have an undue burden. But is that to test, totality? I mean, how many regs here all together do you have? How many? I shouldn't say regs. It looks like, yeah, I think it's about 19 or 20 or so I counted up. And we had a big citation that essentially cited, I don't remember exactly, but more than half of them as having been in violation. And aren't you going to cite her opinion all over the East Coast as showing that no locality can regulate at all? I'm not going to, Your Honor, but the Susquehanna only operates in three states, New York, New Jersey, and Pennsylvania, and I would hope that we would get a little more clarity, perhaps in this court's ruling, as to what ICTA really does or doesn't do. What you're really hearing today and what we heard in front of Judge Hayden was the state and the amici don't agree with the scope of ICTA preemption as Congress promulgated it. Well, there's a place to go for redress, and, in fact, they're doing it. And there are bills pending before Congress that would attempt to narrow the scope. Those bills aren't law, and any more than the testimony of the Deputy General Counsel of the Service Transportation Board that he referred to is indicative of the Board's position. What's indicative of the Board's position is what the Board says in its decision about preemption, two of which we lodged with you just a week ago on our 20-A-J submission. And that Desert X one that you lodged with us said explicitly it had nothing to do with the New Jersey, New York, and Susquehanna. Because they asked to intervene and were refused, and the Service Transportation Board said there's no need because it applies only to that California situation and not at all to New Jersey. But you cited it in support of your position. Judge Shapiro, the STB is very much aware of the pendency of this appeal. And, in fact, in a proceeding relating to a facility in Massachusetts that's referred to in the state's papers that took place a couple months ago, I argued for the Susquehanna. I actually asked the STB if it would stay his hand until this court had an opportunity to rule. They didn't, of course, promise that, but they have not, in fact, come out with a decision in that other case. I think they are looking for some guidance here as well. If I may, you know, the question was – If I could try one thing here with you. If you take a look at the regs, the 2-D regs, under 2, 2 little i's and then you go – or little i, 2 little i's, 3 little i's. They keep going down. The rail carrier – wait till you get – do you have it in front of you? Yes, I do. The rail carrier shall operate in accordance with the following standards. The first one, solid waste shall not remain at the rail facility for more than 10 days, et cetera, than liquid waste for up to 180 days in sealed containers. What is the interference there with federal law? What's the undue burden? Well, again, I'll do my best to answer that, but Judge Hayden wasn't asked to parse these in this way. The state didn't ask her to do that. The state presented these regulations in their totality and applied them. But in that particular case, these facilities, the piles of construction and demolition debris can be quite large. The railroad makes money by moving that waste out in rail cars, transporting it and charging a line haul rate. That's where they make their money. It's not in their interest for it to sit there. But is it possible that if you were actually to go to the bottom of that pile on day 1 and come back on day 10, might you find a piece of the same debris because it hadn't somehow gotten pushed to the outside of the pile and loaded? You might. Would that be a reason to say that the facility should be sited or shut down because of the nature of the operation? The nature of the operation is under control of the railroad and its loader, Susquehanna Bulk Systems, which is a wholly-owned affiliate, a very significant difference, by the way, from your earlier high-tech case that was before this court previously. And they do their best to move that waste out of there, Your Honor. Now, if it's there 12 days or 15 days and we were sited, is that a burden on interstate commerce? I think it could be, yes. Isn't it also a fire hazard? Well, Your Honor, the fire marshal has now cleared these facilities for operation. The ones that are operating have sprinkler systems. There are hoses, fire hoses that are used to just suppress dust. There are misting systems used to suppress dust. So I don't think so. I've been to these facilities. Is it conceivable that a fire could take place? I suppose, but there is fire mitigation in place. It's not just conceivable. Wasn't there a fire at one of these about 16 years ago? Not at one of these facilities, but at a facility, yes. So, I mean, it's not speculative that there could be a fire hazard. And it's not speculative that people were seeing things in the neighborhood and they were quite upset about it. Yes, that's true. Let me say on the fire issue, you know, we're in compliance. That's what I'm trying to say. We have not resisted the suggestion, as the STB has said, that in some limited police power jurisdiction, like fire, like certain safety regulations, that that is not preempted. They've said that consistently and other courts have agreed with that. The devil is in the details. And as the STB said in its high-tech decision, these are very fact-intensive case-by-case analyses. Judge Hayden did that. Very fact-intensive. She had lots of evidence about what was going on at each of these facilities. And her conclusion was these regulations, as applied by the state, were overreaching, overbroad, and constituted a significant burden on the Susquehanna and, therefore, were preempted. What about, let's just take, for example, the next one, two little I's. Solid waste received, stored, or transferred at the rail facility shall at all times be contained in sealed containers that do not leak. And the only time you can open them up is briefly for the purpose of sampling. What's wrong with that? If that were the rule, these facilities would be closed, and so would a number of other solid waste facilities. You don't move construction and demolition debris in sealed containers. It's not economic. It's not realistic. These materials, Your Honor, this is not a glamorous business. This is what you get when you tear a building down and you put it in a dump truck, you drive it to the site, a grappler picks it up, puts it in an open-top railroad car, netting is put over it, and off it goes. So it's not economically. What about the requirement under C, on the page before that, that you supply certain information? Is there anything wrong with supplying information? Not in and of itself, and we do supply information. Each one of these trucks that comes onto our facilities has a manifest. It has to be weighed when it arrives, and it's weighed again when it leaves. And I'm not aware that the state has complained particularly that we have not cooperated with providing them with that information. So is it your position that if it's agreeable to you or convenient to you, you'll comply, but otherwise, if you don't want to do it, there's no way they can force you to do anything? If that's the impression I've given, I'm sorry. No, I'm not trying to say we only want to comply with the laws we see fit. Not at all. What I am saying is we do recognize and are complying with what we think is appropriate, limited police-powered jurisdiction reserved to the state or locality, and I've mentioned particularly fire and safety. It sounds like I'm saying only certain things. Well, that's because every time we say, as the STB has said recently in these two decisions, some, some residual police protection, such as fire and safety. Well, what about having the, on the, it's Roman 12, you have an on-site emergency coordinator who's available during all hours of operation for the purpose of handling emergencies? You don't have a problem with that, do you? Depends what they mean by an emergency coordinator. The devil's in the details. We have representatives on the site whenever the facility is operating. Would the state say that's a, whatever they may think a qualified emergency coordinator is? I'm not sure. I don't know what that term means. Does that mean that they have to certify them? Do they have to go to some particular kind of training? We have an employee who oversees the unloading of the trucks, the loading of the rail cars. There's someone there who weighs the trucks, operates the scales. But what does this mean? Does this mean a fire marshal? Going back to my private life, that's usually what happens when you get together with the other side and you work it out. We have been trying to do that from the beginning of this litigation. There have been numerous, numerous discussions with the state. Many efforts have been made, and obviously we're here today so they haven't been successful. We have not turned our back on the state, Your Honor. Take my word for that. I can't reveal, obviously, confidential settlement discussions, but there have been numerous, numerous meetings. Counsel, you've acknowledged the police powers of fire and plumbing. I think your adversaries make a compelling argument in the sense that they claim that this is a real loophole here, and some of the pictures did not tell a pretty story. And if one were to live proximate to these sites, I could see why one would be quite upset with what had gone on. I don't know what's going on there now. How do you respond to the argument that you're asking us to interpret the ICCTA in such a way as to make these facilities devoid of any environmental regulation? Judge Hartman, I'm not suggesting that at all. In fact, they are subject, at least to some degree, to federal environmental regulation. Again, back to the harmonization point, let me say again, Mr. Strickland's clients have a case pending in federal court in Newark under RCRA addressing these facilities and claiming there have been violations of that. We address those. We're not pleading ICTA preemption as a defense to that. So if there's a problem with the groundwater, then the Clean Water Act applies. If there's too much dust that violates EPA standards, the Clean Air Act applies. In other words, they can call their congressman instead of calling their state rapporteur. They can call EPA regional administrator and have someone sent out, and they've done that. So we're not by any means suggesting that we're home free. It's get out of jail free. No. Would you discuss for a minute the environmental issues? Because although we've talked about fire and plumbing and safety, the concern of at least the Amakai seemed to be environmental issues and the danger to the water aquifer in sensitive areas because of the particular sandy soil of New Jersey. Do you think what you're doing presents any danger to the environment at all? No, Your Honor. In fact, these facilities that are now covered have concrete pad floors. They have storm water runoff systems in place. Again, the state sends in their inspectors, and, you know, from time to time, they have said the tank's too full, get it pumped out. You know, we want the drains in front of the buildings. These are not sophisticated facilities, you understand. They're big tin buildings. The drains get clogged up with mud, clean that out. But beyond those kinds of things, no. We certainly do not believe we are a major polluter of this area, which regrettably, and I know you're familiar with the area, is not literally the most pristine place in the world to start with. I think you're probably all generally aware what that part of New Jersey is like. We are part of a large industrial complex. These facilities are built, as you understand, within the railroad right-of-way. It is a very heavily industrialized area. There's rail traffic. There's motor carrier traffic. There's a lot of stuff going on there already. If I could just one or two points that I didn't. I'll give you one more minute. Okay, thank you. Mr. Auerbacher seemed to want you to be concerned about the fact that there are all these other things going on at these facilities, the tipping, the processing, the sorting, the compaction. Please, again, you drew me to the regulations. Judge Ambrose, take a look at what the regulations say under D. The rail carrier that engages in the transportation of solid waste at a facility owned by the carrier and so on, where there is tipping, processing, sorting, or compaction, and the removal of solid waste. That's their regulations. They contemplate that that's going to happen. That shouldn't be a big surprise. On the issue of look at the legislative history, happy if you do. I think you all understand that this is literally one of the most bright-line, clear preemption provisions of any statute Congress has ever passed. The Fifth Circuit has noted that. The Ninth Circuit has noted that. We think it's very clear on its face that you don't need to look at the statute, that it means what it says in the Supreme Court, and Easterwood in other cases has said that. You don't need to go beyond the bare language of the statute. What about the concern of, well, you ask, I think, Mr. Auerbacher, what should the Susquehanna be doing that it isn't doing, or a question to that effect. And, again, I guess I'd like to close by saying, please take a look at what Judge Hayden said we had done. She had evidence in front of her, the very dramatic change in the nature of these facilities during the pendency of this litigation. Mr. Auerbacher recited to you that most of these original facilities that you see the pictures of, Judge Hardiman, they don't exist anymore. That's not what we're talking about today. And she was very well aware of what we had done and how far we had come. And since her decision, we have been shut down a couple times, as I said, to bring these facilities even further into compliance with fire, safety, and plumbing. Thank you very much. Thank you. Mr. Scagnelli? May it please the Court, John Scagnelli for Appellee MHF Logistical Solutions. MHF's facility is 5800 Westside Avenue. And you're a shipper, right? That's right, a shipper at 5800. And that facility, I want to point out to the Court, is different than the other facilities we've been talking about. There you have direct truck up the ramp into a rail car. There's no processing. There's no separating. There's no manipulating. Nothing happens at all. That is the classic situation for transloading. And that's something that's very important here. We have an absolutely classic transloading situation. I'd also like to weigh in on the Court's questions about the 2D regulations and the scope and whether they can be parsed. I think what Judge Hayden did is you took a very careful look at the 2D regulations and concluded that in their entirety they were so pervasive, they contained so many subjective elements that it was virtually difficult. But why should we borrow a labor term, red line as opposed to blue line? Well, I think our position would be that the regulations are so specifically intrusive on the transloading process and on the activities with respect to  supplying information. How is that so specifically intrusive? Well, if you supply information and there's no reaction on the other side, you get into timing situations. And I think in the Green Mountain case that was the concern of the Court there, that when you get into the regulatory scheme, you're dealing with state officials and you're dealing with local officials and you have the kind of subjectivity that we have. No, that's tacking on something. If something says at the outset of the regs that you need to supply information and you supply that information, where's the timing element that says that there must be something happening once that information is given before you can act? No, I grant you on the supplying of information, I think you're right. And what about the fact of having like an emergency coordinator on site? What's so wrong with that? Well, that's something that, I mean, that might fit in some situation. That might be a possibility. But when we go beyond that, we're talking about adequate fire safety and prevention. We're talking, if you look at the language of the 2D regulations, you have some open-ended subjective terms, which I think give undue discretion to the regulators in terms of taking a position to hold up and interfere with operations. And this is commerce. What about inspections? You represented, and I accept, that you have sealed containers and it's a classic transload. But sealed containers can leak or you might change your methods of operation. Why shouldn't a state inspector be able to check once a month to see that you're doing what you say you're doing? Just a correction, Judge. They're not sealed containers. They're lined trucks. The soil is put in lined containers. And then they're closed. Yeah, put into a rail car, which is then closed and sealed. Is there a possibility of leakage? Well, we're dealing with contaminated soil. It's minimal. Of course, it always is a possibility. But I think we're losing the essential point here. These regulations were directed to rail carriers by their terms. Judge Hayden did not rule that there is no room for nondiscriminatory state health and safety regulations. There can be inspection. Where did she say that? Where was that in her opinion, that acknowledgement? Well, she cites the Village of Richfield Park case and some of the other cases that she cites, including STB decisions. And by referencing them, she also indicated, I think by referencing them, I think she accepted the fact that there is a police power exception. And I think in one other place within her decision, she said there's no police power exception. Although I didn't find anything in the opinion. Let's assume for the moment she explicitly said that there are places or exceptions. Don't you have to go through these regulations and take a look at them and figure out whether they do or do not unduly discriminate and unduly burden? Well, I would submit that Judge Hayden did that and carefully looked at this and felt that they were so comprehensive and so pervasive and so much of an essentially an anticipatory permitting scheme that she felt that there was absolutely no opportunity to do it, that the entire set of regulations was defective. Well, that's what we have to decide if she was correct because the recognition is that they be nondiscriminatory. There are only two places that I could find where nondiscretionary was used. One was in the Vermont case where it was mentioned as an aside and this case which makes it the sine qua non. All regulations are discretionary even for non-carriers, and I don't see how that necessarily makes them discriminatory unless there was something in the record that showed that the application of these regulations was discriminatory as to railroad carriers. Well, I think what Judge Hayden was concerned about was the subjective aspect of the regulations. Again, I would submit that the judge did a very careful job of analyzing it. And the other point I would make— Well, the court, for example, took issue with the state's power to enter and inspect rail facilities. Obviously, that is something that could be abused. But on its face, the regulation seems reasonable. Was there any evidence that you put in that there were inspections done at off hours, funny times, too numerous? Well, I think there were numerous inspections, but I can't draw that conclusion based upon the record that was put in. So if that's the case, then how can you say that the power to inspect should be preempted? No, it's not the power to— I guess my point is the power to inspect exists independent of these regulations. That's the point. That's the point. There's no regulatory gap here. There's no situation where the federal environmental laws apply. They certainly apply in the case of the 5800 facility. State police power laws do apply. There's an opportunity for the state to come in and enforce situations where there are environmental issues. So there really isn't a gap, and we shouldn't— I think what the state and the amicus parties are trying to do is to focus on the gap, state that there's a gap. There really isn't a gap here. Were there complaints about the 5800 facility? Not to my knowledge. That facility was—I'm very familiar with it. That facility was whistle clean. Everything was handled direct truck to rail. Federal scheme, federal inspectors were there. The hazardous materials regulations apply. So if there were no complaints at all about the 5800 facility, why are you here? Well, the state contends that these regulations apply to 5800, and we agree with the railroad that these are impermissible and they should be preempted. There needs to be some scope for preemption for these transloading facilities. Which regulation affects you or impedes you or harms you? Well, I think the entire—I think the point is the entire 2D scheme has—would, if put into operation, would delay, frustrate, hinder the movement of materials through these facilities. And I think you have to really look at the delay and frustration aspect of it. You might have to read them to see if you're complying. But beyond that, don't they distinguish between your operation and the operation of the other scheme? Not really specifically. I think the problem we have here is 5800 has been lumped in with the C&D facilities. And the point we want to make is in doing your analysis, you have to take into account that the C&D facilities have a bit different operation. Oh, they're transloading also, but when you look at 5800, it's quite, quite different. That's a classic transload situation because nothing happens other than having the materials move from truck to railcar. So I appreciate your—I think at the end of the day, the specific facts of this case should control. I think that the 2D regulations are too pervasive and preemption should apply to them. And there's no regulatory gap. Thank you. Thank you. Thank you very much. Mr. Auerbacher, you have three minutes. Your Honor, we—just on the closing comments by counsel, we agree there's no regulatory gap because the state can exercise its police powers in the area of solid waste management. To pick up on a point that I think— No, but that begs the question. Assume for a minute that that's wrong. Do you deny that the Clean Air Act applies, the Clean Water Act applies? They've already conceded they're subject to federal regulation regarding hazmat, transportation, et cetera. Do you agree that the Clean Air Act, Clean Water Act applies? Well, that doesn't address all the environmental issues, but I do agree. Well, but before you—can you answer that before—you do agree. Okay. I do agree, and there's been decisions where— And what are the gaps with regard to federal compliance? What needs to be understood is solid waste transfer stations under RCRA, EPA—Congress specifically said responsibility for solid waste management activities is the state's. Hazardous waste is one thing. You know, there's a delegated program. New Jersey's involved in the hazardous waste delegation. But with respect to solid waste, municipal solid waste, C&D debris, which is not innocuous, EPA does not regulate solid waste transfer stations. They exercise no—they said that's up to the states, and they say it repeatedly. So does that mean the Clean Air Act and Clean Water Act doesn't apply? You just said it does. I'm confused. Who would enforce it? You said that they do apply, but the EPA has no business dealing with it. Then who's going to enforce—let's assume there's a massive leachate problem at one of these sites and it's contaminating the groundwater, a very serious problem. Who's going to go in and enforce that? There are specific delegation agreements under the Clean Water Act, under the Clean Air Act, where New Jersey takes responsibility. So you have the power to solve that then, independently of the Solid Waste Disposal Act? No, because those statutes don't pick up all the issues driven by improper management of solid waste at a transfer station. All right, and what are those issues? Those are the issues that the State Solid Waste Management Act deals with. There may be—you have a permitting program under the Clean Air Act, prevention of serious deterioration. The levels of emissions may not be high enough to trigger that statute. So it's below that. But when you do that, aren't you smack dab in the middle of something where you're preempted? No, we're not. Don't you really need to go to your congressperson? No, we don't, because we strongly believe that the state has the power, because if we don't, nobody does, and I don't think Congress ever intended to create a vacuum over these ancillary facilities. SDB, they don't have regulatory jurisdiction over ancillary facilities. EPA doesn't exercise any environmental regulation of the solid waste aspects that I'm trying to say is below the Clean Water Act and Clean Air Act. One more. Sure, go right ahead. I'm sorry. Counsel, do we have to disagree with Green Mountain in order to go your way in this case? Picking up on Judge Shaparro's comments, I don't know where that test came from. It's a test. We think we meet the test, but we don't know where it derives from. I think the court developed that test themselves, but we would suggest that we meet it. I'm not sure what the answer to the question is. I'm sorry. Do we need to disagree with Green Mountain to go your way? No, because we meet the test. Okay. I just wanted to point out, Mr. Strickland could speak for himself if he had time, but in the Riverkeeper case before Judge Debevoise, the railroad did argue that RCRA was preempted. So they argued their position has evolved through this litigation. It started out absolute, and it's kind of gotten watered down. But that's what good counsel do. It's always good to take consistent positions, though. Evolving is not so bad sometimes. I want to thank you. I want to thank all counsel for an excellently presented argument. And so well done that I would ask that while we are in recess, before Judge Hardiman and I come back with Judge Rendell for other cases, that you confer with either the court crier or the clerk's office to order and have a transcript prepared of this oral argument. Thank you very much. Thank you, Judge.